## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. **23-67(RC)** |
| v. | |
| CHARLOTTE BAMBER | |
| Defendant. | |

### STATEMENT OF THE OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States, by and through its undersigned attorneys, and the defendant, **CHARLOTTE BAMBER ("BAMBER")**, with the concurrence of her attorney, Joseph Murtha, Esq., stipulate and agree that the following facts fairly and accurately describe **BAMBER's** conduct in the offense to which she is pleading guilty. These facts do not constitute all of the facts known to the parties concerning the charged offenses and related conduct. This statement is being submitted to demonstrate that sufficient facts exist to establish that **BAMBER** committed the offense to which she is pleading guilty. **BAMBER** knowingly, voluntarily, and truthfully admits to the facts set forth below.

**I.      Maximum Penalties**

As to Count One, a violation of 18 U.S.C. § 1001 carries a maximum sentence of 5 years' imprisonment; a fine not to exceed $250,000, pursuant to 18 U.S.C. § 3571(b)(3); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(3); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

**II.      Elements of the Offense**

As to Count One, the elements of the charged offense, a violation of 18 U.S.C. § 1001, are:

1) The defendant made a statement;

2) The statement was false;

-1-

3) The statement was material;

4) The defendant acted knowingly and willfully; and

5) The statement pertained to a matter within the jurisdiction of the executive branch of the United States government.

## III.    Brief Statement of Facts

1.      From approximately August 2011 to May 2019, **BAMBER** was employed as a trader at an international commodity trading firm ("Trading Firm A"), working in both Geneva, Switzerland and Houston, Texas.  In that capacity, **BAMBER** traded different petroleum products, including oil distillates and liquid propane gas.

2.      At times relevant to this Statement of the Offense, the U.S. Department of Justice ("DOJ"), including through the Federal Bureau of Investigation ("FBI"), was investigating allegations that Trading Firm A, and certain individuals at that firm, were engaged in commodity price manipulation.  In the course of that investigation, **BAMBER** self-disclosed to the DOJ that she and other traders at Trading Firm A had, in fact, engaged in manipulative trading conduct.

3.      On September 8, 2020, **BAMBER** entered into a non-prosecution agreement ("NPA") with the U.S. Department of Justice, Criminal Division, Fraud Section relating to her manipulative trading conduct while working at Trading Firm A.

a.      In the NPA, **BAMBER** admitted that she had committed wire fraud and commodity price manipulation while working as a trader at Trading Firm A.  Specifically, among other things, **BAMBER** admitted that, at the instruction of her supervisors, she placed orders during the S&P Global Platts ("Platts") window for certain products to manipulate the daily Platts benchmark price for certain physical commodities.  **BAMBER** admitted that she placed non-economic orders in the Platts window to artificially alter the

market price of certain commodities and to benefit Trading Firm A, which had contracts for physical delivery that were priced based on the Platts benchmark price assessments that **BAMBER** manipulated.

        b.     As part of the NPA, **BAMBER** agreed to comply with its terms, including the requirements that she (i) truthfully and completely disclose all information with respect to her activities about which the United States might inquire of her, and (ii) provide truthful and complete information during, among other things, interviews with the United States.

        4.     On several occasions between 2019 and 2022, **BAMBER** met with the United States, including FBI agents, to answer questions regarding, among other things, her participation in, and knowledge of, manipulative trading activity at Trading Firm A.

        5.     In several of those meetings, **BAMBER** was asked explicitly whether she had been in contact with any employees of Trading Firm A and, if so, to describe the contact.

        6.     For example, on February 18, 2022, BAMBER met with FBI agents and DOJ Fraud Section attorneys in Washington, D.C. for an interview. During the interview, BAMBER was asked whether she had been in contact with any current employees at Trading Firm A. In response, BAMBER identified three current employees with whom she had been in contact and stated there were no other current Trading Firm A employees with whom she had been in contact. That statement was a lie.

        7.     In truth and in fact, on at least three occasions prior to the February 18, 2022 interview, BAMBER had created pseudonymous email accounts on end-to-end encrypted email platforms and sent emails containing threatening and/or harassing messages to several other current Trading Firm A employees, including employees who were subjects of the United States' investigation into Trading Firm A. In these pseudonymous emails, **BAMBER** referenced, among

other things, the United States' investigation into manipulative trading activity at Trading Firm A. Specifically:

   a.   On November 7, 2021, **BAMBER** sent a pseudonymous email to Employee 1's Trading Firm A email address that said, "You should probably tell your family what is about to be made public. Everything you do always catches up with you. Always. // You'll get a great roommate, don't worry.";

   b.   On December 24, 2021, **BAMBER** sent a pseudonymous email to Employee 2's Trading Firm A email address that said, "[Employee 2's wife's name] will find a nice man to raise her kids and they will take his name. // There is a market in the industry over how many years you will do // Merry Christmas and enjoy"; and

   c.   On January 10, 2022, **BAMBER** sent a pseudonymous email to Employee 2's Trading Firm A email address that said, "Tick Tock. There's no way out for you. // Enjoy balding even further, if that's possible".

8.   Moreover, on at least five occasions after the February 18, 2022 interview, **BAMBER** created additional pseudonymous email accounts and sent additional threatening and/or harassing emails to current Trading Firm A employees, including employees who were subjects of the United States' investigation into Trading Firm A. Specifically:

   a.   On March 2, 2022, **BAMBER** sent a pseudonymous email to Employee 2's Trading Firm A email address that said, "May is going to be a life changing month for you. // Management are throwing you under the bus. You're facing decades. // Tick. // Tock.";

   b.   On April 9, 2022, **BAMBER** sent a pseudonymous email to the Trading Firm A email addresses for Employee 3, Employee 4, and Employee 5 that said

-4-

"[Employee 3 and Employee 4] are trying to negotiate a plea deal that includes testifying against [Employee 5].";

    c.     On May 25, 2022, **BAMBER** sent a pseudonymous email to Employee 2's Trading Firm A email address that said, "How is your week going? // Wait until your name is blasted out internationally and everyone at your school knows! you'll have bigger problems though, like showering in front of 50 people // HAHHAHAHAHAHAHAHAH";

    d.     On July 9, 2022, **BAMBER** sent a pseudonymous email to Employee 1's and Employee 6's Trading Firm A email addresses that said, "Guess who snitched on the other about C07 payment approvals? // One of you will lose everything."; and

    e.     On August 11, 2022, **BAMBER** sent a pseudonymous email to the Trading Firm A email addresses for Employee 2, Employee 5, and Employee 7 that said, "[DOJ attorney name] has won another manipulation case against [a financial institution], leaving more resources and an emboldened team to focus on [Trading Firm A]. // Knowing he is cornered, [Employee 5] is trying to shift blame onto [Employee 7] (and his predecessor) with his authority as Compliance Manager as well as regional managers such as [Employee 2] who he says operate independently of the HQ."

9.    None of the emails in Paragraphs 7 and 8 above were addressed to any of the three current Trading Firm A employees that **BAMBER** stated, in the February 18, 2022 interview, were the only three Trading Firm A employees with whom she had been in contact.

10.    **BAMBER** did not disclose these emails or her prior false statements until confronted with evidence of the emails on October 6, 2022. Only at that point did **BAMBER** acknowledge that she had sent the pseudonymous emails and that she had not answered truthfully

during prior interviews, including on February 18, 2022, when asked about contact with employees of Trading Firm A.

11.     **BAMBER's** false statements about her contact with Trading Firm A employees after **BAMBER** had entered into the NPA were a breach of the terms of her NPA and were material to the DOJ's investigation of unlawful trading activity at Trading Firm A.

12.     **BAMBER** knowingly and willfully made these false statements.

13.     **BAMBER's** false statements were made in a matter within the jurisdiction of the Executive Branch of the United States government, namely, in connection with the DOJ's investigation into manipulative trading activity at Trading Firm A.

Respectfully submitted,

GLENN S. LEON
Chief, Fraud Section
Criminal Division
United States Department of Justice

By:     Matthew F. Sullivan, Trial Attorney
John Liolos, Trial Attorney
Avi Perry, Deputy Chief

### DEFENDANT'S ACCEPTANCE

I have read the foregoing Statement of Offense, and I have discussed it fully with my attorney, Joseph Murtha. I fully understand this proffer and I acknowledge its truthfulness, agree to it, and accept it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this proffer fully.

Date: 6-26-23

Charlotte Bamber
Defendant

### ATTORNEY'S ACKNOWLEDGMENT

I have read every page constituting the government's statement of offense related to my client's guilty plea. I have reviewed the entire proffer with my client, Charlotte Bamber, and have discussed it with him fully. I concur in my client's agreement with and acceptance of this proffer.

Date: 6-26-23

Joseph Murtha   GARY PROCTOR
Attorney for Defendant

-7-