<pre>
 1                 UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2     _____

 3     United States of America,    )  Criminal Action
                                    )  No. 1:23-cr-00067-RC
 4                    Plaintiff,    )
                                    )  Sentencing
 5     vs.                          )
                                    )
 6     Charlotte Bamber,            )  Washington, D.C.
                                    )  October 24, 2023
 7                    Defendant.    )  Time:  10:00 a.m.
       _____

 8
                   Transcript of Sentencing
 9                       Held Before
            The Honorable Rudolph Contreras
10             United States District Judge

11
                    A P P E A R A N C E S
12
       For the Government:    Matthew F. Sullivan
13                            John J. Liolos
                              UNITED STATES DEPARTMENT OF JUSTICE
14                            1400 New York Avenue, Northwest
                              Washington, D.C. 20530
15
       For the Defendant:     Gary E. Proctor
16                            LAW OFFICES OF GARY E. PROCTOR, LLC
                              8 East Mulberry Street
17                            Baltimore, Maryland 21202

18     Also Present:          Robert Walters, U.S. Probation
       _____
19
       Stenographic Official Court Reporter:
20                            Nancy J. Meyer
                              Registered Diplomate Reporter
21                            Certified Realtime Reporter
                              333 Constitution Avenue, Northwest
22                            Washington, D.C. 20001
                              202-354-3118
23

24     Proceedings recorded by mechanical stenography.  Transcript
       produced by computer-aided transcription.
25
</pre>

```
1                    P R O C E E D I N G S

2             THE COURTROOM DEPUTY:  This is Criminal Action 23-67,

3    United States v. Charlotte Bamber.

4             Counsel, please step forward to the podium and state

5    your appearances for the record.

6             MR. SULLIVAN:  Good morning, Your Honor.  Matthew

7    Sullivan on behalf of the United States, and joining me at

8    counsel's table is John Liolos.

9             THE COURT:  Good morning.

10            MR. PROCTOR:  Good morning, Your Honor.  My name is

11   Gary Proctor, and I represent Ms. Bamber, who is present in

12   court this morning.

13            THE COURT:  Good morning.

14            MR. PROCTOR:  How are you, sir?

15            THE COURT:  Good.

16            THE PROBATION OFFICER:  Good morning, Your Honor.

17   Robert Walters on behalf of probation.

18            THE COURT:  Good morning.

19        Do you guys have something to say or --

20            MR. PROCTOR:  No, sir.

21            THE COURT:  Okay.  Go ahead and have a seat.

22        All right.  Ms. Bamber and defense counsel, have you

23   reviewed the presentence report as revised following the

24   defense and the government's submissions?

25            THE DEFENDANT:  Yes.
```

```
1              THE COURT:  Any additional objections?

2              MR. PROCTOR:  No, sir.

3              THE COURT:  Okay.  Any from the government?

4              MR. SULLIVAN:  No, Your Honor.

5              THE COURT:  Okay.  All right.  Under Federal Rule of

6   Criminal Procedure 32(i)(3)(A), the Court will accept the

7   presentence report as its findings of fact on issues not in

8   dispute.

9         This case falls within the Sentencing Reform Act of 1984

10  under which Congress created the United States Sentencing

11  Commission which has issued detailed guidelines for judges such

12  as myself to consider in determining the sentence in a criminal

13  case like this.  The commission has set sentencing ranges for

14  specific offenses, and those ranges are contained in the

15  Guidelines Manual.  However, in light of the Supreme Court's

16  decision in Booker, the guidelines are not mandatory.  They are

17  advisory but must be consulted by the Court in determining the

18  appropriate sentence in a case.

19        Therefore, I will assess and determine the proper

20  sentence in this case by reference to and in consideration of

21  the guidelines in the first instance, but the guidelines will

22  be treated as advisory, not mandatory, and there's no

23  presumption that the guideline sentence is the correct

24  sentence.  The guidelines will be considered, along with all

25  the other relevant factors under 18 U.S.C. 13 -- rather,
```

1    3553(a).

2         Defendant has pled guilty to making a false statement in

3    violation of 18 U.S.C. § 1001.  As reflected in the presentence

4    report, using the *Guidelines Manual*, the base offense level is

5    six.  There are no special offense characteristics or

6    adjustments for a role in offense.  So the adjusted offense

7    level remains at six.  There's a two-level decrease for clear

8    acceptance of responsibility, which results in a total offense

9    level of four.

10         There are no convictions reported, which results in zero

11   criminal history points, which results in a criminal history

12   category of I.  The guidelines range for imprisonment based on

13   a total offense level of four and a criminal history of I is

14   zero to six months.

15         Any objections to those calculations?  Defense counsel?

16            MR. PROCTOR:  No, sir.

17            THE COURT:  Government?

18            MR. SULLIVAN:  No, Your Honor.

19            THE COURT:  All right.  As I said, under the law,

20   following *Booker*, the guidelines are advisory in the case but

21   will be considered fully by the Court, along with all of the

22   other relevant factors under 3553(a).

23         Would the government like to address the Court regarding

24   sentencing?

25            MR. SULLIVAN:  Yes.  Briefly, Your Honor.

```
1              THE COURT:  All right.
2              MR. SULLIVAN:  Do you prefer I come to the podium
3    or --
4              THE COURT:  Yes, at the podium, please.
5         So I get two very different stories about the
6    defendant's role in the whistleblowing, and the government's
7    been fairly silent on how valuable her whistleblowing was to
8    the government and how detrimental these falsehoods have been
9    to the investigations.  So let me hear some more about each of
10   those things.
11             MR. SULLIVAN:  Certainly, Your Honor.  And if I
12   hesitate, it's only because her whistleblowing related to
13   ongoing investigations, and so kind of what is public and what
14   is not and kind of putting things out there without folks
15   having an opportunity to respond, I just want to be careful to
16   police that.
17        So the defendant did provide, you know, substantive
18   information that advanced our investigation and that in certain
19   ways we have been -- we were able to corroborate.  The
20   investigation was ongoing for several years, involved
21   interviewing the defendant, as well as other individuals,
22   document review, a substantial amount of complex trade data
23   analysis that was -- cost a significant amount of money for the
24   government to hire a data consultant to do that analysis and
25   perform that analysis.
```

1    So -- and I think as we mentioned in our sentencing

2    memorandum, the false statements charge here arises from her

3    statements about contact with employees of Trafigura.  It does

4    not relate to the information that she provided in connection

5    with her cooperation of the substantive information about the

6    market manipulation that she engaged in at Trafigura and that

7    she provided information about to the government.  So the

8    information definitely had value.

9    That said, I think when receiving information from a

10   cooperating witness, particularly one who has received a

11   nonprosecution agreement, assessing the candor of the witness

12   in, kind of, the totality as opposed to specific pieces of

13   evidence that you may be able to corroborate, I think, is -- is

14   why we're here.  And the fact that the defendant was not, you

15   know, fully and completely truthful with the government

16   regarding her actions in terms of contacting employees at

17   Trafigura, including some who were subjects of the government's

18   investigation, doing it over a number of months -- this wasn't

19   just one email or two emails.

20   Doing it by creating synonymous email addresses to hide

21   who it was from and to send emails that -- that were very --

22   very pointed and very direct in making jokes about making

23   friends in prison and -- and don't worry, your wife will find

24   somebody else while you're in prison.  I mean, very, kind of,

25   direct cutting, harassing comments to people that you could

1    understandably find unsettling, if you receive them.

2           And so I think in terms of looking at information from a

3    cooperating witness in the totality, we have to look at both

4    the substantive information about her trading at Trafigura that

5    we were able to corroborate with certain parts, as well as

6    these other statements about her hiding of these emails that

7    she was sending over a number of months.

8           And I think that's why we are here today, to show, kind

9    of, the importance of being fully and completely truthful with

10   the United States whenever you're providing information; in

11   particular, when you're operating under the benefit of a

12   nonprosecution agreement.

13          You know, this wasn't an instance where the FBI shows up

14   at your house at the crack of dawn, you don't have a lawyer,

15   you're being asked questions, and you give certain answers.

16   This was in the context of the defendant voluntarily meeting

17   with the government to provide information, represented by

18   counsel, you know, being told when the interviews were, being

19   able to prepare for these interviews.  So this was not kind of

20   the surprise factor that you may see in certain -- or maybe

21   alleged in certain false statements cases.  That's just not --

22   that's not the case here.

23          And so I think in the government's view, the -- the

24   importance of the guilty plea in this case is to demonstrate

25   how paramount it is to provide truthful and complete --

1   "complete" -- information to the government whenever you're

2   speaking to them.  And so I think that -- that's why we're

3   here today, and that's why, notwithstanding the value and

4   the benefit of -- of the substantive information that the

5   defendant provided -- and, frankly, admitted to in her

6   nonprosecution agreement.  In the nonprosecution agreement,

7   there was a statement of facts, essentially, where she admitted

8   to engaging in market manipulation and so -- but that's kind of

9   one piece.

10          But when looking at the full picture in terms of -- of

11  why we're here today, it's, you know, being fully and

12  completely candid with the government, especially if you're

13  under a nonprosecution agreement, some sort of agreement where

14  you're getting the benefit from the government; where the

15  government is declining to prosecute you.  And so, you know,

16  that's -- that's why, notwithstanding the benefit provided to

17  the government from the cooperation, I think we're here today

18  and the false statement charge was brought against the

19  defendant.

20          Notwithstanding all of that, the government is

21  recommending a probationary sentence with a respectful

22  recommendation of a fine and mental health or substance

23  abuse treatment as directed by -- or deemed necessary by

24  probation.

25          In terms of specific deterrence, I think the collateral

1    consequences of this conviction will specifically deter the

2    defendant.  The defendant had lived in the United States.  She

3    is a citizen of the United Kingdom.  So her ability to enter

4    and reenter the United States, I think there will be, you know,

5    definite consequences for that from the felony conviction in

6    this case.

7         The defendant previously worked in the commodities oil

8    trading industry, heavily regulated industry.  So a felony

9    conviction may have serious consequences as to her ability to,

10   you know, seek employment in the -- in the same industry where

11   she had worked for a number of years.

12        THE COURT:  Well, is the conviction going to prohibit

13   that, or is what she's admitted to going to prohibit that?

14        MR. SULLIVAN:  I think both.  I think -- I'm not an

15   expert on this.  But I think a felony conviction, if you're

16   entering into any sort of regulated industry, I think certainly

17   can provide challenges to gaining employment, notwithstanding

18   just a general felony conviction for any sort of employment

19   where that can at times prevent a challenge.

20        So -- so that's, kind of, in terms of specific

21   deterrence, even with the probationary sentence in this case.

22        And then the larger point of general deterrence goes

23   back to my, kind of, earlier comments about the, just, crucial

24   necessity of providing truthful and complete information to the

25   government, especially when you're operating under some sort of

1      cooperation or nonprosecution agreement where you're getting a

2      benefit from the government for that information.

3          And I think in terms of a general deterrence message,

4      this will highlight the deep importance of that and that in

5      this case, as I described, a lot of time, resources, money,

6      man-hours, woman-hours spent on this case has, essentially,

7      been squandered because of what the defendant has done and how

8      that has called her character for truthfulness into question,

9      notwithstanding the fact that we have been able to develop

10     independent evidence to -- to corroborate certain things that

11     the defendant had said.

12         So, Your Honor, for those reasons, the government is

13     recommending a probationary sentence.  But if the Court has any

14     additional questions about cooperation, I'm happy to address

15     those.

16             THE COURT:  I understand your reluctance to give me

17     more information.  But as a practical matter, because she will

18     not be in this country, a probationary sentence is not that

19     meaningful.  So the fact you're not recommending any time of

20     incarceration leads me to believe that you thought her

21     cooperation was pretty -- not -- not just are you not

22     recommending incarceration, but you didn't pull the

23     nonprosecution agreement for these falsehoods.

24         So, presumably, the cooperation she provided was very

25     valuable?

1           MR. SULLIVAN:  Yes, it was -- it was valuable.  I

2   mean, it's a little hard sitting here today kind of looking

3   back through the prism of the false statements the defendant

4   has now made, but certainly the -- the information that she

5   provided was -- was, you know, a central part of what we were

6   investigating in this case.

7           And Your Honor is correct.  She did -- you know, she did

8   violate the nonprosecution agreement; that there was serious

9   consideration as to whether or not to bring, you know, the

10  charges that were related to that nonprosecution agreement.

11  Obviously, we have only brought the false statement charges in

12  this case.  But that is something the government thought about

13  and wrestled with a lot, frankly, before we landed on the false

14  statements in this case.

15          So I appreciate the Court's point about that.

16          THE COURT:  So has there been a single criminal

17  prosecution or civil settlement that has resulted directly from

18  this defendant's cooperation?

19          MR. SULLIVAN:  Not that I have been involved in or

20  aware of, Your Honor.

21          THE COURT:  All right.  So when the defense argues

22  that her cooperation has been literally worth hundreds of

23  millions of dollars, that's a bit of hyperbole?

24          MR. SULLIVAN:  So I may not be privy to all the

25  information that -- that the defendant has provided.  For

1    example, I'm in the, kind of, market manipulation, securities

2    fraud unit.  There's a Foreign Corrupt Practices Act unit.

3    There's different components of the department who she may have

4    provided information to that I am not aware of.

5         But based on my understanding, sitting here today, I am

6    not aware of a civil or criminal resolution that is based on or

7    arose from information that the defendant provided.

8         THE COURT:  And if there were some sort of

9    administrative CFTC civil settlement, you would be aware of

10   that?

11        MR. SULLIVAN:  I think I would be.  But, again, I

12   don't want to -- I don't know the basis for the statements by

13   defense counsel, but I don't want to say that -- you know, it's

14   possible I'm missing something.

15        THE COURT:  All right.  With respect to the damage of

16   these falsehoods, you know, ironically, from what I read,

17   Michael Cohen is testifying today, who is in a similar

18   situation.  But -- but despite that, I presume it was pretty

19   impactful to your ability to use her as a witness going

20   forward.

21        MR. SULLIVAN:  Absolutely.  To be candid, we could

22   not use her as a witness going forward.

23        THE COURT:  All right.  All right.  Anything else --

24   any other points you want to make?

25        MR. SULLIVAN:  No, Your Honor.  Thank you.

```
1              THE COURT:  All right.  Thank you.
2         Mr. Proctor.
3              MR. PROCTOR:  Thank you, Your Honor.
4         To follow up on where you started and where you
5    finished, actually, I'd like to ask permission from Steve Kohn
6    to address the Court as a sentencing witness.
7         Mr. Sullivan wasn't there for most of my client's
8    whistleblowing, and neither was I.  Mr. Kohn was her lawyer
9    throughout it.  Now, I've asked him to temper some of his
10   comments about things that aren't in the public record yet and
11   may be ongoing.  But I would like him to briefly address the
12   Court as to the -- the nature and history of my client's
13   whistleblowing because he was seated right next to her for its
14   entirety.
15             Would the Court allow that?
16             THE COURT:  Does the government have an objection?
17             MR. SULLIVAN:  No objection, Your Honor.  Just as --
18   as defense counsel noted, to the extent and -- I think
19   Mr. Kohn's comments are -- are kind of properly calibrated
20   here.  But to the extent there's a discussion of any ongoing
21   investigations -- obviously, I want the Court to have all the
22   information it needs for sentencing.  But to the extent we get
23   into that territory, whether we could have a sidebar or do it
24   under seal, that would be my -- government's only request.  I'm
25   not sure that's going to happen, but just --
```

```
1           THE COURT:  Do you want to take a five-minute break
2    and get a proffer from Mr. Kohn?
3           MR. SULLIVAN:  No.  I've gotten a proffer from
4    Mr. Kohn, and I believe we should be fine.
5           THE COURT:  Okay.
6           MR. SULLIVAN:  But just in case -- to the extent the
7    Court has questions of Mr. Kohn that I haven't anticipated,
8    that would be the request.
9           THE COURT:  Sure.
10          MR. PROCTOR:  Thank you, Judge.
11      Would you like me to stand next to him or be seated?
12          THE COURT:  You can be seated.
13          MR. KOHN:  Good morning, Your Honor.
14          THE COURT:  Good morning.
15          MR. KOHN:  Thank you for this opportunity to address
16   the Court.
17      My name is Stephen Kohn.  I'm an attorney licensed in
18   the District of Columbia.  My entire career has been
19   representing whistleblowers, which I started in 1984.  I've
20   represented clients in high-profile and low-profile cases in
21   which they've been witnesses to the SEC, Commodity Futures
22   Trading Commission --
23          THE COURT:  Are you the Cohen in Phillips & Cohen?
24          MR. KOHN:  No.  I'm the Kohn in Kohn, Kohn &
25   Colapinto.
```

```
1              THE COURT:  Okay.  All right.

2              MR. KOHN:  We're competitors.

3         -- FBI, and Department of Justice.

4              An example of some of the prior cases was the Second

5    Chance Body Armor case where my whistleblower exposed that

6    thousands of defective vests were sold to law enforcement.

7    More recently, the Danske Bank money laundering case in which

8    my client exposed the largest money laundering scandal in

9    history, 230 billion, laundered from Russia primarily to the

10   West.  And in these cases, we worked closely with the

11   United States government and Department of Justice.  So I'm

12   familiar with what is needed from a whistleblower and how these

13   cases work.

14             I've -- I also teach a seminar on whistleblower law at

15   the Northeastern University School of Law annually.  And the

16   U.S. Department of State has sponsored me on numerous

17   international visits where we're working with international

18   partners on international corruption, which is a high priority

19   of the United States.  This case fell into the international

20   corruption category.

21             I'm here to speak about Charlotte Bamber, whom I've

22   known since 2019.  She came into my office.  We filed our

23   first claim with the Commodity Futures Trading Commission in

24   June of '19.  She had a tape recording that she had made at

25   work documenting bribery, and that triggered the investigation.
```

1   She came in as what's known as an anonymous and confidential

2   witness under the Dodd-Frank act, which means under the law

3   the government was supposed to structure the case in a way that

4   she would never have to testify, and maintain her

5   confidentiality.

6        Very shortly thereafter, it became clear that the DOJ

7   needed to be involved.  We agreed.  The FBI gave her

8   confidential informant status, which is the most they could

9   give, but with an understanding that she would be this

10  confidential witness.

11       This is why when the government says things have been

12  corroborated, from the very beginning of the case, since it was

13  assumed that she wouldn't be called, the government was keenly

14  interested in other witnesses she could identify, documents,

15  the way the company was structured, the way it worked, and,

16  significantly, an understanding of the market manipulation that

17  was at the core of these cases.

18       So I'll never forget.  So we sat in a meeting -- and

19  they mentioned experts.  And they did bring an expert in from

20  Chicago on market manipulation and oil trading.  They didn't

21  know anything.  My client sat with all of the records and went

22  through, very clearly, educating the government's experts on

23  precisely how to read these complex charts and to understand

24  precisely where and how the manipulation occurred.

25       So when you look at her contributions, they were

1    enormous.  She sat through many meetings.  Also, because they

2    were looking to back up her testimony, the FBI and all the

3    government agents asked if she would wear a wire.  And she

4    engaged in voluntary one-party taping in which the FBI took

5    over the control of.  All those tapes went to the government.

6    Everything to the government.  But she was able to sit and meet

7    with witnesses and obtain invaluable information.  So, again,

8    within this structure.

9        The first successful prosecution in the case was against

10   Vitol trading.  This was the first case in which the Commodity

11   Futures Trading Commission used the concept of market

12   manipulation in an anti-corruption transnational case.  CFTC's

13   fine was about 93 million.  The Department of Justice had a

14   very heavy fine.  And the heart of it was her testimony about

15   the manipulation of what's known as the Platts window, which is

16   what she explained in detail.

17       She never was needed to be called as a witness.  Her

18   credibility, whatever it was, was immaterial because of the

19   evidence she gave.  But when this prosecution hit in

20   December 2020 -- and the nonprosecution agreement was

21   effectuated in December '20 -- 2020 -- all of the testimony was

22   given voluntarily, outside of any nonprosecution agreement.

23   She was a total voluntary witness.

24       But when this prosecution was announced, the defense bar

25   had issued publications about how incredibly significant it was

1    that CFTC was now joining in international anti-corruption and

2    that market manipulation was now coming to the fore.  And Vitol

3    was the largest oil trader in the world.

4         Now, you may say, well, she didn't work for them, but

5    they interacted.  They -- there was, essentially -- I don't

6    want to go into the details, but given her role in what I'll

7    call Trading Company A or 1, which is still pending, she

8    interacted with other people from other companies.

9         THE COURT:  Now, did -- you know, I'm less familiar

10    with Dodd-Frank.  But did she get any sort of the Dodd-Frank

11    equivalent of a relator share of that resolution?

12         MR. KOHN:  No.  No.  Most likely -- and I'm not going

13    to speak out of turn, but there's a provision in it that if you

14    do get convicted of a crime, you lose all your rights under

15    that law, in terms of compensation.  Whether or not that would

16    impact the Vitol case or another case or this case will be

17    decided by the agency.  But there is such a provision.  As of

18    today, she's received zero.  All of her trips to the

19    United States, everything she did was on her own dime.  And

20    she's at risk of losing everything.  The Vitol case, and just

21    to summarize, was predicated on precisely how Dodd-Frank was

22    supposed to work, which is she's in the background.

23         Now, I do have to now take a little blame for what is

24    here and, I think, the government also.  In a typical

25    whistleblower case where you're going to fight the company

1    directly -- say, in a retaliation case -- you have to carefully

2    vet your client for any problems.  Ms. Bamber had filed a major

3    sexual harassment lawsuit against her employer.  There clearly

4    were a lot of issues.  But because under Dodd-Frank we

5    were looking at her more as this outside witness who wouldn't

6    be called directly, I think that type of vetting process

7    didn't happen with us, but also didn't happen with the

8    government.

9         So the fact that she had an alcohol problem was well

10   hidden.  We never saw it.  She never attended anything drunk,

11   never smelled any alcohol.  Clearly was there.  Whatever

12   trauma she suffered through the sexual harassment, again,

13   wasn't the focus.  We knew it was there, but we never focused

14   on it.

15        Vitol was successful.  I have spoken to government

16   agents who have given her significant credit.  You've asked

17   that question.  They unquestionably have credited her

18   significantly on that historic prosecution.

19        The second case to resolve was against the third-largest

20   oil trader in the world, and that case settled for about

21   $1.1 billion.  Again, they looked at the --

22             THE COURT:  What was the name of the company?

23             MR. KOHN:  Glencore.  You can just go right on the

24   internet and all of these things will pop up.  If you go Vitol

25   sanction, Glencore sanction, it will be there.

1    In the Glencore case, when you read what they were being

2    sanctioned for, you will, again, see the Platts window being

3    discussed, which is what she had.  That is, as I say, this

4    complex trading structure that no one could see how it was

5    being manipulated until Charlotte Bamber came forward and

6    explained it.  And once she explained it, you could look at the

7    documents and figure it out.

8    The other thing that Ms. Bamber did, in addition to

9    wearing -- doing taping, she identified witnesses.  I sat in

10   those meetings.  This person may give you information.  This

11   person may give you information.  This person not.  So in

12   combination with the tapes -- we don't know what the government

13   actually did, if they played them and got people to talk or how

14   it happened.  But you have to see that she was giving a window

15   into this major transnational oil company -- oil trading

16   company with relationships, with people.  So, again, that was

17   all, we presumed, corroborating or in the process.  So Glencore

18   pled.

19   Then we go to the third company.  In regard to that, I'm

20   not going to give any specific information.  That case is

21   ongoing.  And I informed the government that I would not

22   discuss it.

23   I will state that it is my professional opinion having

24   sat in all of the interviews -- I think every single interview

25   she had with the government about that -- that the type of

1   information she gave that was material to any ongoing case can

2   be or has been corroborated.

3         I also want to state that I have had -- look at my

4   notes.

5         Ms. Bamber has suffered significantly.  A whistleblower

6   who comes in voluntary to the government under any program

7   walks in with a tremendous amount of stress and anxiety.  This

8   is -- there's a very significant article in the *New England*

9   *Journal of Medicine* -- and I can give the citation to it.  This

10  was a study of whistleblowers who won their cases under the

11  False Claims Act, so a similar law to Dodd-Frank.  And they

12  interviewed and discussed the experiences and how these

13  whistleblowers -- what they -- their medical and psychological

14  issues.

15        Here's what they found:  severe marital strain --

16  Ms. Bamber's not married.  But just, again, the family, that

17  type of strain -- family conflicts; stress-related health

18  problems.  Working with whistleblowers over the years, you see

19  this because the stress is massive because you don't know the

20  outcome, and you're always fearing retaliation.  And it gets

21  worse and worse.

22        Of these stress-related health problems at the -- that

23  the *New England Journal of Medicine* documented were shingles;

24  psoriasis, p-s-o-r-i-a-s-i-s; immune disorders; panic attacks;

25  asthma; insomnia; joint disorder; migraine headaches;

1    generalized anxiety.  Within their sample, I can tell you that

2    is what a whistleblower goes through, but the duration of the

3    investigation contributes to stress.  That's also their

4    finding.

5         In Ms. Bamber's case, that played out very painfully.

6    The case started when she resided in Texas, had friends,

7    and actually had a job.  But because she lost her job at

8    Trafigura, her immigration status had changed.  Where she was

9    working was demanding that she go off to Switzerland where she

10   was not going to go because whistleblowers have no rights

11   there, the oil traders aren't stationed there.  She would not

12   go to Switzerland.  So the choice was Switzerland or lose her

13   job.

14        She tried -- she hired an immigration lawyer.  She

15   worked with -- communicated to the Justice Department.  We

16   tried whatever we could to keep her in the United States

17   because she stated that this was where her support network was.

18   If she went off to the UK, she'd be isolated.

19        Well, it didn't work.  She went to the UK, and there we

20   saw significant deterioration of her mental health.  She

21   reported the types of things that whistleblowers report when

22   they are under tremendous stress.  You know, essentially -- I

23   will not call it paranoia.  But I will call it things -- like,

24   you get afraid.  You're isolated.  Again, she didn't have the

25   support network.  She couldn't come into her office to talk to

1    us about anything.  She's over there.  But things were getting

2    worse and worse.  We didn't see it.  We didn't see what was

3    happening.  And, apparently, as we now know, she engaged in

4    certain emails that were unfortunate.

5          It is my professional opinion that -- that the core

6    evidence that she provided is all capable or has been

7    corroborated.  And I think that -- when you look at the two

8    successful prosecutions where she was never called to a

9    grand jury, never presented as a witness, never put on a

10   witness list, never -- did anything that you would expect of an

11   informant for which there was an intent for them to come

12   forward.

13         Now, maybe in this third case they wanted to use her

14   more.  Maybe they intended to call her.  I don't know.  I do

15   not have any insight into what their planning was.  But I will

16   say based on my own observations, my discussions with

17   representatives from the Commodity Futures Trading Commission,

18   my discussions with F- -- an official from the FBI after the

19   indictment, that the -- that certain forces, like, in the

20   United States have recognized her contributions and recognized

21   that her information is still valuable.

22         In conclusion, I want to say there's a piece of this

23   case that I find very important.  I do not question the

24   government's interest in deterring witnesses from giving false

25   evidence to the United States.  Period.  I think my client --

1    my former client -- I do not represent her in any DOJ

2    proceeding right now.  I think she fully understands that.  She

3    understands the problems it caused.  She's regretful.  But I

4    understand their interest.

5         But I'm also here to call the Court's attention to

6    another interest, which is I have to work with international

7    whistleblowers or domestic.  I have to explain to them the

8    risks of going forward.  Under none of these whistleblower laws

9    does the whistleblower get immunity.  The whistleblower must

10   walk in under Dodd-Frank, under False Claims, under the newly

11   enacted anti-money laundering statute, under the tax evasion

12   statute.  They must walk in voluntarily, which means they can't

13   get something of value from the United States in exchange for

14   their testimony.

15        They're always at risk for some form of prosecution

16   because most of the very good whistleblowers, as Ms. Bamber,

17   worked in institutions where illegal activity was occurring.

18   She was just doing her job, but it was market manipulation.  I

19   have to convince them to trust the United States, to trust the

20   DOJ, to come forward and give that evidence without fearing

21   prosecution.

22        This case will be carefully followed worldwide.  The --

23   the oil traders involved are the three largest in the world.

24   It will be carefully followed.

25        I think that the punishment that she's already had and

1   the recommendation of the United States to stick with probation

2   is completely justifiable, both in the context of the

3   contributions she gave but also in the context of the impact of

4   this proceeding on other potential whistleblowers.  The message

5   has been sent:  You better be truthful.  But we don't want

6   another message sent, which will scare people off.

7       So with that, I'm more than willing to answer any

8   questions that the Court may have about my years of

9   representing her, the proceedings, any information that this

10  Court may find helpful in coming to a just resolution.

11      THE COURT:  So one of the things that left me a

12  little unclear, about you saying that the agency has the final

13  decision on whether she receives any sort of financial benefit

14  for these resolutions.  For the Glencore and the Vitol trading

15  cases, are those issues still open?

16      MR. KOHN:  Everything is open.  It is my opinion that

17  this case centers around the one prosecution that is still

18  pending, and that will then relay everything else.

19      There's a concept -- it's -- as you can imagine, we're

20  doing our best.  We -- Ms. Bamber has a new attorney to

21  represent her before the Commodity Futures Trading Commission,

22  and I'm sure he'll do his best.  But as I say, the law states

23  that a criminal prosecution means nothing.  It also states that

24  if they find you gave false testimony, you get nothing.  So how

25  that plays out in any of these cases is not known.  It's new

1    territory.  But she does have an excellent lawyer to help her

2    navigate that process.

3              THE COURT:  All right.  Thank you.

4              MR. SULLIVAN:  Your Honor, may I respond just to a

5    few points briefly?

6              THE COURT:  Of course.

7              MR. SULLIVAN:  Your Honor, I'd hoped to avoid this,

8    but I think there's certain things that I need to correct for

9    the record.  And, again -- well, I'm still unaware of any basis

10   to say that the defendant provided information that led to the

11   Vitol or Glencore resolutions.

12        Notably, the Vitol resolution for the CFTC included

13   market manipulation and FCPA.  For DOJ, it was only FCPA.  It

14   was not market manipulation.

15        For Glencore -- and I prosecuted the Glencore case.  I

16   did the corporate resolution.  I investigated it for a number

17   of years.  On the market manipulation side, I can definitively

18   say the information did not rely -- the investigation did not

19   arise from information from the defendant.  It arose from

20   a different individual, Emilio --

21             THE COURT REPORTER:  I'm sorry.  Say that again.

22             MR. SULLIVAN:  Sorry.  Emilio, E-m-i-l-i-o, Heredia,

23   H-e-r-e-d-i-a.

24        So I can't speak for the CFTC and the basis of the --

25   they had, you know, a parallel civil investigation along with

1    ours.  I can't speak to the basis definitively for their

2    investigations.  But on the DOJ side, the defendant did not

3    provide any information that resulted in the Glencore

4    resolution.

5         The other thing that I think just needs correcting is

6    this idea that the defendant thought she would never be called

7    as a witness.  In her nonprosecution agreement, part of the

8    agreement is to provide truthful and complete information and

9    testimony when requested by the United States.

10        So I don't know what assumptions were made, but I think

11   it's clear in a nonprosecution agreement that if the government

12   is building a case based on your information, you may have to

13   testify, whether it's a grand jury, whether it's, you know, a

14   public trial or what have you.  And so the idea that -- even

15   putting testimony aside, it -- a cooperating witness's

16   credibility -- I think Mr. Kohn said it -- is immaterial, and

17   that is -- could not be more wrong.

18        Any witness's credibility -- it's why we have them

19   testify live.  It's why the jury watches their cred- -- watches

20   them testify, so they can assess the credibility of a witness.

21   A witness's credibility is central to the information they

22   provide.  So I think the idea that the defendant was providing

23   information, didn't have to testify, so, you know, credibility

24   isn't much of an issue, I think, just wholly misses the point

25   and, I think, kind of disregards, you know, statements that are

1    made both in the NPA about telling the truth and statements

2    that are made often at witness interviews about the importance

3    of telling the truth, but underselling things, not overselling

4    things.  Just telling, you know, the straight truth and the

5    government will, you know, take it from there in terms of

6    whether a case should be brought.

7         And so -- and -- Your Honor, and I think that just rolls

8    into Mr. Kohn's last point about the prosecution of

9    whistleblowers and deterring whistleblowers; and the government

10   fully recognizes the importance whistleblowers play in kind of

11   pulling back the curtain, providing information to the

12   government.  There's, obviously, not a criminal whistleblower

13   program, but the CFTC, the SEC, these are important programs

14   that I think have had, kind of, very publicized, you know,

15   important resolutions and successes.

16        I think having to tell the truth, and only tell the

17   truth, I think, is not a -- a -- I don't see that as being a

18   speed bump to somebody who wants to be a whistleblower.  There

19   may be other reasons for that.  But all you have to do is tell

20   the truth, the full and complete truth.  And so I think whether

21   this is going to deter whistleblowers and whether that's even a

22   3553(a) factor, I think, one, it won't deter whistleblowers,

23   and, two, I'm not sure it's totally relevant to the sentencing

24   of the defendant in this case.

25        So unless the Court has any other questions, thank you

1      for your indulgence.

2              THE COURT:  I don't.

3          All right.  Mr. Proctor, you can finish your

4      presentation.

5              MR. PROCTOR:  Thank you, Judge.

6          You know, I was kind of worried about going down a

7      whistleblower rabbit hole at all because it really does -- you

8      know, we've been here for how long and we've barely mentioned

9      Ms. Bamber, the person.

10         I would just note, you know, Mr. Kohn, when he was

11     speaking, the nonprosecution agreement came later and didn't

12     change.  Yes, I thought he was talking more about initially she

13     planned to remain in the shadows.

14         And, you know, you asked the government was my memo

15     hyperbole.  I think everyone agrees Ms. Bamber has met with law

16     enforcement 15 times, 5 times in person.  And then when COVID

17     came along, we weren't doing that.  So another 10 by telephone

18     or Zoom.  I never had law enforcement meet with someone

19     15 times that didn't have very valuable information to someone

20     somewhere.  So it was not hyperbole, Judge.

21             THE COURT:  Well, I mean, I was making reference to

22     the -- reference to her information resulting in the recovery

23     of millions of dollars.

24             MR. PROCTOR:  I think Mr. Kohn spoke to that,

25     Your Honor.  I really don't need to speak to it any more.

1      What else I planned to mention is covered in my

2   sentencing memo that I'm sure you've read.  So I would just be

3   repeating myself.

4      I would note she's traveled twice to the United States.

5   I've -- because I'm British myself, I've had quite a few

6   British clients over the years.  Every single one of them were

7   extradited.  No one ever came here voluntary to face the music.

8   There's never been an extradition request.  There's never been

9   an arrest warrant issued.

10      Ms. Bamber should -- she gets two levels for acceptance.

11   She would have got two levels for acceptance if she fought

12   extradition for two years.  So I believe that is a relevant

13   3553(a) factor.

14      You know, the offense level is four, but even that --

15   eight days from now will have the zero criminal history points

16   amendment, which would take it down to a two.  And I suggest we

17   don't come back in February to do it then, when it would apply

18   to people already sentenced.  But we -- you know, Your Honor

19   should depart -- doesn't change the guidelines anyway --

20   two levels to reflect the zero criminal history points

21   amendment.  And under the 5C1.1 commentary that will be in

22   force in a week, it suggests that the Court consider sentences

23   without prison for people to whom it applies, which will be

24   Ms. Bamber.

25      You know, I'm paraphrasing, but I agree with the

1    government.  The conviction is the message you need to send.

2    You will have a felony conviction for the rest of your life.

3    There is no expungement.  You will not be able to work in

4    your chosen profession with a felony conviction.  You will

5    have problems entering this country from here on out.  I

6    don't know if immigration is going to wave her through, but I

7    doubt it.  You will have problems going through other

8    countries.

9         That's the message we need to send; the fact that

10   someone got prosecuted for lying to law enforcement with their

11   status as a whistleblower.  We don't need to then double down

12   on it by sending her to jail too.

13        You know, I mentioned in my memo that my client's mental

14   health and alcoholism were spiraling out of control because of

15   the stress of all this and COVID and losing her job -- Mr. Kohn

16   spoke to -- and 15 different things.  You know, the presentence

17   report does a good job of setting out her childhood and how

18   miserable it was and how she overcame all that.  You know,

19   under 3553(a), the person here before you is very different

20   than the person doing those things.

21        I guess I -- I disagree with one thing you said, that

22   probation would not be meaningful.  We can cap -- we -- you can

23   author special conditions of probation.  And one of those could

24   be -- and I wouldn't object to it -- that she be evaluated for

25   alcoholism and that -- follow through with any treatment.  I

1    will undertake to provide probation from the UK, if that's

2    where she is, with a report from someone licensed there to

3    evaluate people for alcoholism.

4         And if they say she needs to go to three AA meetings a

5    week, we'll get meeting stamps saying she was here on Friday at

6    5 o'clock and went to the meeting.  If that was attached as a

7    special condition and she were to violate it, then Your Honor

8    would be entitled to revoke her probation.

9         And she came to court voluntarily this time knowing she

10   might go to jail.  I don't know why she wouldn't come the next

11   time.

12        Same thing for mental health.  As a special condition of

13   probation, you are to see someone licensed in mental health in

14   the United Kingdom and follow through with any treatment they

15   might require in your country of residence.  So that even if

16   she were to move somewhere, it would apply.  That's probably a

17   better way to put it.

18        And those are meaningful conditions.  Granted, they

19   would be more difficult to enforce in the UK, but, again, she

20   came here without being required to do so, without an

21   extradition request or an arrest warrant being issued.

22        So to me, that's -- it is meaningful to impose probation

23   with those standard conditions.  And I believe under 3553(a),

24   that -- that is a just punishment.  And she's been going

25   through the ringer for a long time.

1      So for those, Judge, I would ask that Your Honor impose

2  probation with whatever standard conditions regarding substance

3  abuse and mental health that you see fit.

4      THE COURT:  All right.  I have a question for you

5  about the fine.  The presentence report refers to some assets

6  that she got as part of the settlement, but they weren't

7  really reported or any other bank accounts or anything of

8  that nature.  How am I to assess what the appropriate fine

9  would be?

10      MR. PROCTOR:  You know, I'm glad I don't -- my client

11 is completely illiquid.  If you impose a fine, she is going to

12 need some time to pay it.  I don't mind telling you, one of her

13 lawyers paid for her flight here today and another one paid for

14 her hotel.  She is completely illiquid.  So it's not that she

15 has the funds to pay it.

16      If you assess a fine, she will have to liquidate some

17 assets, sell some property, and that would take time.  So given

18 the probationary period that I expect the Court to impose,

19 prior to its termination, any fine assessed being payable would

20 give her time to do that.

21      THE COURT:  How much is she paying a month to have

22 her pets taken care of?

23      MR. PROCTOR:  It's in the report.  If I can have a

24 second.

25      THE COURT:  Yeah.

```
1              MR. PROCTOR:  $2,520.

2              THE COURT:  Per month?

3              MR. PROCTOR:  Yes, sir.

4              THE COURT:  Okay.  Any other points you want to make?

5              MR. PROCTOR:  No, sir.

6              THE COURT:  All right.  Thank you.

7         Does the defendant wish to address the Court?

8              MR. PROCTOR:  Can I have a moment, please?

9              THE COURT:  Sure.

10             MR. PROCTOR:  If I may -- and you can see,

11   Your Honor, Ms. Bamber is choking up and crying.  So she

12   doesn't feel able to at the moment.  I talked to her this

13   morning about what she planned to say, and it was simply to

14   apologize, to point out she's in a different space now and

15   she's getting treatment and she's sober.  And she regrets

16   sending these messages, and she wished to assure the Court that

17   it wouldn't happen again.

18             THE COURT:  All right.  Thank you.

19        All right.  So let's start with some of the financial

20   issues.  So the -- there's no restitution at issue or

21   forfeiture, for that matter.

22        So with respect to the fine, the maximum fine is

23   $250,000.  The guidelines range is $500 to $9500.  Probation

24   recommended a fine of $5,000.  I will accept that

25   recommendation and impose a fine of $5,000 to be paid within
```

1    the period of probation I will impose.

2          The Court is to impose a sentence sufficient but not

3    greater than necessary to comply with the purposes set forth in

4    the subsection.  I'm to consider the nature and circumstances

5    of the offense and the history and characteristics of the

6    defendant and the need to impose a sentence that reflects the

7    seriousness of the offense, promotes respect for the law, and

8    to provide just punishment for the offense.

9          The offense is serious but did not involve violence or

10   personal financial gain.  However, the false statements went on

11   for some time and were not self-disclosed.  It seems the

12   behavior would have gone uninterrupted if the FBI had not

13   confronted her with the evidence.

14         The defendant has reportedly been useful in prior and

15   ongoing investigations; although there seems to be some dispute

16   about some of that so the -- concerning market manipulations in

17   commodities markets.  But the false statements have caused harm

18   to the government's underlying investigation and the ongoing

19   investigation, at least in that it harms defendant's

20   credibility and possible usefulness as a witness.

21         The false claims were made in the context of stating to

22   FBI agents that she was not in contact with certain former work

23   colleagues when, in fact, she was anonymously sending them

24   harassing and threatening communications about their alleged

25   involvement in the wrongdoing underlying the government's

1   investigation.

2        The defendant is a 36-year-old woman with an

3   undergraduate and master's degrees from prestigious British

4   universities.  Until recently, she has been gainfully employed

5   her entire adult life.  She asserts that she was terminated

6   from a recent position when she reported wrongdoing as a

7   whistleblower as part of her efforts during the underlying

8   investigation that led to the false claims at issue here.  That

9   termination reportedly resulted in a very large settlement

10  payment.

11       But notwithstanding all of that, the defendant had a

12  troubled childhood.  The defendant's parents separated when she

13  was 13 years old.  Defendant reports that her now-deceased

14  father was extremely physically, mentally, and emotionally

15  abusive to her mother, herself, and her siblings.  In addition,

16  the defendant reports further abuse that was set forth in the

17  defendant's memo.

18       Defendant further reports periods of homelessness after

19  her parents' separation and divorce.  Perhaps as a result of

20  all of these troubles in her youth, defendant reports that she

21  was diagnosed with anxiety and depression as a teenager and

22  young adult.  Moreover, she reports that she participated in

23  therapy and was prescribed pharmaceuticals for those

24  conditions.  And she reports heavily consuming alcohol during

25  her years as a commodities trader and attributes, in part, the

1   alcohol abuse to the poor judgment exhibited in the underlying

2   offense.

3        The Court is to consider a sentence that affords

4   adequate deterrence to criminal conduct.  I doubt personal

5   deterrence will be much of a factor for defendant given all she

6   has been through and the fact that it is very unlikely she will

7   be in a position to repeat this type of offense given the

8   serious implications of her ability to perform her professional

9   work in the future.

10        But her falsehoods caused harm to the government's

11   investigation -- in particular, the ongoing investigation --

12   but general deterrence is a concern of the Court.  A term of

13   incarceration can deter others from concluding that the

14   worst -- a term of not -- a term not including incarceration

15   can convince others that the worst that can happen if one gets

16   caught is simply enduring a limited set of collateral

17   consequences.

18        But the government does not seek incarceration, and

19   given that the falsehoods were not directly about the

20   wrongdoing underlying the government's investigation, but

21   rather about defendant's behavior collateral to the underlying

22   wrongdoing, perhaps incarceration is unnecessary.

23        With respect to protecting the public from further

24   crimes of the defendant, again, it's probably unlikely that

25   defendant will be in a position to repeat these or other crimes

1   of this type.

2        Nothing has been brought to my attention concerning

3   needed educational or vocational training, medical care, or

4   other correctional treatment in the most effective manner,

5   other than possible psychological treatment.  But given that

6   the defendant will be out of the country, it would be very

7   difficult, if not impossible, for probation to monitor those

8   types of requirements.  So I don't intend to impose any.

9        I'm to consider the kinds of sentences available.  Given

10  the nature of the crime, the unlikelihood that it will be

11  repeated, and the fact that the defendant will not remain in

12  this country, incarceration may not be appropriate.

13       With respect to the kinds of sentences and sentencing

14  range established for the applicable category of offense

15  committed by the applicable category of defendant as set forth

16  in the guidelines, the Court has considered the range provided

17  for by the guidelines which allows for nonincarceration

18  sentences.  No pertinent policy statements issued by the

19  Sentencing Commission have been brought to my attention.

20       The Court is to impose a sentence that avoids

21  unwarranted sentence disparities among defendants with similar

22  records who have been found guilty of similar conduct.  The

23  statistics provided in the presentence report indicate that in

24  the cases of similarly situated defendants, approximately

25  44 percent, or nearly half, did not receive sentences involving

1    incarceration so -- and nonincarceration sentences are well

2    within the mainstream.

3            As I indicated, there's no restitution at issue.

4            I will now indicate the sentence to be imposed, but

5    counsel will have one more opportunity to make any legal

6    objections before the sentence is actually imposed.

7            Mr. Proctor, any objections to any of the factors I've

8    considered?

9                MR. PROCTOR:  No, sir.

10               THE COURT:  Any from the government?

11               MR. SULLIVAN:  No, Your Honor.

12               THE COURT:  All right.  Ms. Bamber, if you could come

13   to the podium.

14           Pursuant to the Sentencing Reform Act and the guidelines

15   and the sentencing statute, 18 U.S.C. 3553, it is the judgment

16   of the Court that you're sentenced to one year of probation.

17   The probation office will set the terms of any reporting,

18   et cetera.  But given that you'll be out of the country, I

19   suspect that that will not be particularly onerous.

20           To the extent that it's required, you're to cooperate

21   with ICE on any removal from this country.

22           And I will also impose a requirement that you have no

23   contact with individuals from Trading Firm A, as it's defined

24   in the underlying charge.

25           You're further ordered to pay a fine in the amount of

1    $5,000 and a special assessment of $100.  The Court finds that

2    you do not have the ability to pay interest and, therefore,

3    waives any interest or penalties that may accrue on these

4    balances.  And the financial obligations are immediately

5    payable to the clerk of this court.  But if that is not

6    possible, then at increments -- monthly increments that

7    will have it entirely paid off by the end of the one-year

8    probation.

9         The probation office shall release the presentence

10   investigation report and the judgment and commitment order to

11   the Bureau of Immigration and Customs Enforcement to facilitate

12   any deportation proceedings, if necessary.

13        Any other issues that we need to resolve today?

14             MR. PROCTOR:  No, sir.

15             MR. SULLIVAN:  Just one item, Your Honor.  In terms

16   of the no-contact order, could it just specify that no contact

17   with any current or former employees of Trading Firm A?

18             THE COURT:  Any objection from defense?

19             MR. PROCTOR:  No, sir.

20             THE COURT:  Okay.  I'll do that.

21        All right.  With no objections, I'll order the sentence

22   imposed as I just stated.

23        I don't believe there are any open counts that need to

24   be dismissed; is that correct?

25             MR. SULLIVAN:  That's correct, Your Honor.

```
1              THE COURT:  Okay.  Ms. Bamber, you were convicted by
2     a plea of guilty.  You can appeal your conviction if you
3     believe that your guilty plea was somehow unlawful or
4     involuntary or if there's some other fundamental defect in the
5     proceeding that was not waived by your guilty plea.  But your
6     guilty plea contained a rather broad waiver of appellate
7     rights.  So if you're inclined to appeal, talk that over with
8     your counsel.  In addition, you may have some statutory rights
9     to appeal regardless of the waiver, and counsel might be able
10    to advise you on that as well.
11            To the extent you decide to appeal, you have the right
12    to apply for leave to appeal in forma pauperis.  That means
13    without the payment of cost.  And if you so request and
14    qualify, the Clerk of the Court will prepare and file a notice
15    of appeal on your behalf; although I note that you're
16    represented by very able counsel who can assist you in that
17    process.
18            But, most importantly, with few exceptions, any notice
19    of appeal must be filed within 14 days of the entry of the
20    judgment.  I suspect that that entry will be sometime later
21    this week.  So 14 days from that point.
22            Anything else we need to cover?
23            MR. PROCTOR:  No, sir.
24            MR. SULLIVAN:  No, Your Honor.  Thank you.
25            THE COURT:  All right.  Thank you.
```

1          Go ahead.

2          THE PROBATION OFFICER:  Your Honor, I've already

3    mentioned it to Ms. Bamber, but we would ask that the Court

4    order her to report to the Marshals Service for processing.

5    She was never processed.

6          And I believe there's a footnote in the recommendation

7    that even though there's no conditions in place and she's not

8    going to be supervised, pursuant to 42 U.S.C. 14135, her DNA

9    still needs to be collected.  I'm not sure if the marshals will

10   do that or if probation will do that, but just an order for the

11   collection of DNA.

12         THE COURT:  All right.  I will include that.

13         THE PROBATION OFFICER:  Thank you.

14         And for clarification, you are -- the reporting will be

15   nonreporting supervision?

16         THE COURT:  I'll let you work out the details of that

17   with her.  To the extent what -- do whatever you normally do in

18   this unusual situation.

19         THE PROBATION OFFICER:  Yes, sir.  Thank you.

20         THE COURT:  All right.  Thank you.

21         And I'll order that the processing take place as well.

22   Hopefully that can be accomplished today.

23         And with respect to the payments, I'm told that $5,000

24   divided by 12 is $416.  So the payments will be no less than

25   $416 a month, if it can't be paid immediately.

1          Anything else to resolve today?

2              MR. PROCTOR:  No, sir.

3              MR. SULLIVAN:  No, Your Honor.

4              THE COURT:  All right.  Thank you.  You're excused.

5      Good luck, Ms. Bamber.

6              (Proceedings were concluded at 11:09 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3              I, Nancy J. Meyer, Registered Diplomate Reporter,

4       Certified Realtime Reporter, do hereby certify that the above

5       and foregoing constitutes a true and accurate transcript of my

6       stenograph notes and is a full, true, and complete transcript

7       of the proceedings to the best of my ability.

8

9                       Dated this 27th day of October, 2023.

10

11                      /s/ Nancy J. Meyer
                        Nancy J. Meyer
12                      Official Court Reporter
                        Registered Diplomate Reporter
13                      Certified Realtime Reporter
                        333 Constitution Avenue Northwest
14                      Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25